IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Carrie Guyton,                    :         Case No. 2:14-cv-502

          Plaintiff,              :

     v.                           :         JUDGE ALGENON L. MARBLEY
                                            Magistrate Judge Kemp
Exact Software North America,     :

          Defendant.              :



OPINION AND ORDER

     This matter is before the Court on a motion to compel
discovery filed by Plaintiff Carrie Guyton.  (Doc. 32).
Defendant Exact Software North America filed an opposition to the
motion to compel (Doc. 33), and Ms. Guyton filed a reply brief
(Doc. 37).  Exact Software North America filed a motion for leave
to file a sur-reply instanter. (Doc. 40).  For the reasons set
forth below, the motion for leave to file a sur-reply instanter
will be granted, and the motion to compel will be granted in part
and denied in part.

I. Background

     On May 27, 2014, Plaintiff Carrie Guyton filed this lawsuit
against her former employer, Exact Software North America
("Exact"), alleging that Exact unlawfully terminated her
employment based upon her age and gender.  In the complaint, Ms.
Guyton alleges that she is a female who "was born on August 6,
1958, and was employed by Defendant or its predecessor entities
for approximately twenty five (25) years beginning in 1985."
(Doc. 1 at ¶8).  Ms. Guyton alleges that she received successive
promotions and consistently favorable performance evaluations
throughout her employment with Exact and its predecessors, up to

and including her last performance review which took place on February 12, 2010. Ms. Guyton adds that "Exact never wrote her up for any performance issues." Id. at ¶10.

Ms. Guyton alleges that, on April 22, 2010, Exact informed her that it was terminating her employment for performance-related reasons, effective June 7, 2010. Ms. Guyton alleges that she "pressed for information" regarding the performance-related reasons in light of her positive performance evaluation on February 12, 2010. Id. at ¶12. Ms. Guyton asserts that "[i]n a conference call with her supervisor, Norah McDonald[,] and the Human Resources Manager, Leslie Pannkuk, Plaintiff was told that she was being terminated for performance issues such as typos and electronic mail issues." Id. Ms. Guyton asserts that electronic mail issues were not part of her job description, and she was not presented with any document containing a typo despite requesting one. Ms. Guyton also asserts that Exact did not follow its policy for progressive discipline as set forth in its "Corrective Action Policy." Id. at ¶14.

Ms. Guyton alleges that she spoke to Mitch Alcon, who was then the Chief Executive Officer of Exact North America, regarding the termination of her employment. More specifically, Ms. Guyton asserts that on May 11, 2010, during a visit to Exact's Columbus office, Mr. Alcon informed her that her employment was not terminated for performance-related issues, and he remarked that "sometimes change is good." Id. at ¶15. Ms. Guyton alleges that, during the same visit, Mr. Alcon made statements to other employees in which "he implied that some employees had been around for too long, and he would continue to replace current employees with younger ones." Id. at ¶16. Ms. Guyton alleges that Ms. Pannkuk expressed similar thoughts in a global human resources meeting on May 18 and May 19, 2010, when she commented that "'the workforce in the Americas is older and

-2-

they [sic] are causing the health insurance premiums to rise' and that 'there is a paradigm shift and the older workers have been there too long.'" Id. at ¶17.  Finally, Ms. Guyton asserts that, after unlawfully terminating her employment, Exact hired a much younger woman named Danielle Bourke to fill her position.

Based upon these allegations, Ms. Guyton sets forth a claim of age discrimination in Count I of the complaint and seeks "a sum equal to her back-wages to the time of reinstatement, plus interest, damages for lost retirement benefits, insurance, and other fringe benefits, lost future earnings and front-pay, liquidated damages, and costs, including reasonable attorney's fees." Id. at ¶20.  In Count II of the complaint, Ms. Guyton sets forth a claim of gender discrimination, but her reply memorandum indicates that she has abandoned that claim.

Prior to filing this lawsuit, Ms. Guyton filed a charge of unlawful age and gender discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued her a right to sue letter.  In her motion to compel, Ms. Guyton generally alleges that Exact made false statements to the EEOC during its investigation of her unlawful discrimination charge.  Ms. Guyton also asserts that Exact has improperly failed to disclose the identity of the individual responsible for making the decision to terminate her employment.  Ms. Guyton explains that the motion to compel "does not involve only a discrete set of documents that can be reviewed in camera and produced in discovery." (Doc. 32 at 27).  Rather, the motion is "much broader," in that Ms. Guyton seeks the following relief:

> a. An Order requiring Exact to identify and produce all emails, instant messaging and any other communications internally at Exact (including searching for emails to, from and/or copied to Harry Merkin, Mitch Alcon, Norah McDonald; Leslie Pannkuk and in-house attorney Jim Workman) as well as communication to, from and/or copied to any lawyer at Ulmer & Berne that relate in any way to

the termination of Carrie Guyton. In an effort to narrow this part of the Order, only those documents from the date of Ms. Guyton's EEOC filing (July 29, 2010) and earlier need to be subject to this search and production. For any documents that Exact claims in good faith are protected by the attorney client privilege, a privilege log should be produced to the Court and opposing counsel, and all such documents should be produced to the Court for an *in camera* inspection; and

b. An Order requiring Exact to identify and produce all emails, instant messaging and any other communications internally at Exact (including searching for emails to, from and/or copied to Harry Merkin, Mitch Alcon, Norah McDonald; Leslie Pannkuk and in-house attorney Jim Workman) as well as communication to, from and/or copied to any lawyer at Ulmer & Berne that relate in any way to the identity of the person who made the decision to terminate Carrie Guyton. Plaintiff respectfully suggests this section of the Order should not contain a time limitation because the subject is narrowly tailored to focus specifically on who the decision-maker was and the false statements made to the EEOC on this issue. For documents in which Exact claims in good faith to be protected by the attorney client privilege, a privilege log should be produced to the Court and opposing counsel, and all documents produced to the Court for an *in camera* inspection; and

c. An Order requiring Exact to identify and produce all email, instant messaging and any other communications internally at Exact (including searching for emails to, from and/or copied to Harry Merkin, Mitch Alcon, Norah McDonald; Leslie Pannkuk and in-house attorney Jim Workman) as well as communications to, from and/or copied to any lawyer at Ulmer & Berne that relate in any way to any affidavits prepared for or in response to Carrie Guyton's EEOC claim. Plaintiff respectfully suggests this section of the Order should not contain a time limitation because subject is narrowly tailored to focus specifically on the EEOC affidavits. For documents in which Exact claims in good faith to be protected by the attorney client privilege, a privilege log be produced to the Court and opposing counsel and all documents be produced to the Court for an *in camera* inspection; and

d. An Order requiring Exact and Ulmer & Berne to produce, in native format with all metadata available, as well as

-4-

all electronic or hardcopy drafts of any affidavits in the possession or control of Exact or Ulmer & Berne relating to Carrie Guyton's EEOC claim (including affidavits prepared for Norah McDonald, Leslie Pannkuk, Mitch Alcon and any affidavits that were not submitted to the EEOC); and

e. For documents that are responsive to this Court's Order but Exact claims no longer exist, a log should be produced to the Court and opposing counsel identifying all such documents and indicating when such documents were deleted, destroyed or lost; and

f. An Order stating that the crime-fraud doctrine applies to communications between Exact's lawyers and Leslie Pannkuk regarding 1) who made the decision to terminate Carrie Guyton; 2) any statements made to the EEOC in the affidavits from Ms. McDonald or Ms. Pannkuk; and 3) any statements made to the EEOC regarding the person who made the decision to terminate Ms. Guyton; and

g. An Order requiring Exact to produce Leslie Pannkuk at the Federal Courthouse in Columbus, Ohio within 30 days of the Order for a continued deposition on the subject matter of: 1) who made the decision to terminate Carrie Guyton; 2) statements made to the EEOC in affidavits from Ms. McDonald and Ms. Pannkuk; 3) any other false statements Exact made to the EEOC; and 4) the general subject matters addressed in Ms. Pannkuk's first deposition where she was instructed not to answer the question and the Court has determined the subject of the question was not protected by the attorney client privilege or the privilege did not apply based upon the crime-fraud doctrine; and/or

h. If Exact is unable or unwilling to produce Ms. Pannkuk for a deposition in Columbus, Ohio, an Order that Exact is prohibited from: 1) submitting any testimony from Ms. Pannkuk at the summary judgment phase or at trial; 2) submitting any evidence that attempts to explain or justify why the false statements were made to the EEOC; and

i. If this Court determines plaintiff is not permitted to obtain additional discovery consistent with this motion, Order that Exact is prohibited from submitting any evidence or argument at summary judgment, trial or any other time, that addresses, explains or justifies the

> false statements made to the EEOC, the false statements
> made in affidavits submitted to the EEOC and/or Exact's
> changing positions about who made the decision to
> terminate Ms. Guyton.

Id. at 27, 32-34.

On October 26, 2015, Exact filed an opposition to Ms. Guyton's motion to compel.  In its opposition, Exact maintains that it never made false statements to the EEOC during its investigation.  Exact further argues that Ms. Guyton only speculates and does not provide any proof of its allegedly false statements.  Exact claims that Ms. Guyton is not actually seeking discovery, but instead is improperly "attempt[ing] to prejudice Exact before this Court as the summary judgment deadline approaches." (Doc. 33 at 17).  Exact urges this Court to deny Ms. Guyton's motion to compel in its entirety.

Ms. Guyton filed a reply brief in support of her motion to compel on November 9, 2015.  (Doc. 37).  Ms. Guyton argues that Exact's opposition is merely an effort to defend its unlawful actions.  Ms. Guyton states that, although they may be relevant to a summary judgment motion, Exact's arguments do not provide a basis upon which to deny her motion to compel.

On November 19, 2015, Exact filed a motion for leave to file a sur-reply instanter.  (Doc. 40).  In the motion for leave, Exact seeks to file a sur-reply in order to "clarify the misstatements contained in Plaintiff's Brief." (Doc. 40 at 1).  For good cause shown, the Court will grant the motion.  The Court has considered the contents of the sur-reply attached to the motion for leave in issuing a decision in this Opinion and Order.

## II. Discussion

The motion to compel focuses on two affidavits (one of which was unsigned) submitted by Exact to the EEOC concerning who made the decision to terminate Ms. Guyton's employment.  The first is the unsigned affidavit of Norah McDonald.  Ms. McDonald's

-6-

affidavit provides, in pertinent part:

    10.    Prior to April 22, 2010, I viewed Ms. Guyton's recent job performance as containing "performance issues such as typos and electronic mail issues" as constituting "substandard work" and "fail[ure] to meet Company work standards in terms of quality and quantity," as outlined in Exact's Ethics and Standards of Conduct Policy. *See* Ex. 3.

    11.    I work closely with Leslie Pannkuk, a Manager in Exact's Human Resources department, on personnel issues.

    12.    Prior to April 22, 2010, I worked closely with Ms. Pannkuk regarding Ms. Guyton's recent "performance issues such as typos and electronic mail issues."

    13.    Prior to April 22, 2010, pursuant to Exact's Corrective Action Policy and Ethics and Standards of Conduct Policy, Ms. Pannkuk and I decided to terminate Ms. Guyton's employment.

(Doc. 39, Ex. 2 at 1-2). Ms. Guyton argues, and Exact does not deny, that Ms. McDonald did not see, sign, or authorize the affidavit Exact submitted on her behalf to the EEOC. Exact submitted the second affidavit on behalf of Leslie Pannkuk. Ms. Pannkuk's affidavit, which she signed and swore to, states, in pertinent part:

    16.    Prior to April 22, 2010, I agreed with Ms. McDonald that Ms. Guyton's "performance issues such as typos and electronic mail issues" constituted "substandard work" and "fail[ure] to meet Company work standards in terms of quality and quantity," as outlined in Exact's Ethics and Standards of Conduct Policy. *See* Ex. 3.

    17.    Prior to April 22, 2010, pursuant to Exact's Corrective Action Policy and Ethics and Standards of Conduct policy, Ms. McDonald and I decided to terminate Ms. Guyton's employment.

<u>Id</u>., Ex. 13 at 3. There is no dispute that Ms. Pannkuk signed the affidavit without making any changes to it.

-7-

In her deposition in this case, Ms. McDonald testified that the affidavit which Exact submitted on her behalf to the EEOC contained untrue statements. More specifically, Ms. McDonald testified that, contrary to the statements in her affidavit, she did not view Ms. Guyton's performance issues, such as typos and electronic email issues, as constituting substandard work or a failure to meet company work standards in terms of quality and quantity; she did not work closely with Ms. Pannkuk regarding Ms. Guyton's performance issues; and she and Ms. Pannkuk did not decide to terminate Ms. Guyton's employment. Ms. McDonald also testified that, despite a statement in her unsigned affidavit to the contrary, Ms. Bourke replaced Ms. Guyton within the Exact sales and marketing department.

In its opposition to the motion to compel, Exact admits that Ms. McDonald's affidavit and Ms. Pannkuk's affidavit "erroneously identified [them] as the decision makers regarding Plaintiff's termination from employment." (Doc. 33 at 8). However, Exact states that it accurately responded to the EEOC's requests for information when it identified Mitchell Alcon as the person who made the "final decision to discharge Plaintiff" and Ms. McDonald as the person who made the "recommendation to discharge Plaintiff." Id. at 8-9. Exact states that "a more complete answer" should have identified Harry Merkin, Exact's Vice President of Marketing, "and arguably Leslie Pannkuk" as people who also made the recommendation to discharge Ms. Guyton. Id.

Ms. McDonald's deposition testimony in this case conflicts with Exact's position that it provided accurate information to the EEOC's discovery requests, at least to the extent that it pertains to whether Ms. McDonald recommended Ms. Guyton's dismissal. When asked during her deposition in this case if she recommended Ms. Guyton's discharge, Ms. McDonald answered "No." (Doc. 30, Ex. 1 at 85-86). Ms. McDonald testified that she did

-8-

not believe that Ms. Guyton provided substandard work product or
that Ms. Guyton needed to be terminated for performance-related
reasons. Id. at 44-45. Ms. McDonald further testified that she
voiced her opposition about the decision to terminate Ms.
Guyton's employment to Mr. Merkin and Ms. Pannkuk. Id. at 48.
In Ms. Pannkuk's deposition in this case, she confirmed that Ms.
McDonald did not recommend Ms. Guyton's dismissal.

Ms. Guyton argues that Exact's misrepresentations to the
EEOC were intentional. To that end, Ms. Guyton asserts:

> the record suggests that Exact and its lawyers knew Ms.
> McDonald would not have signed the affidavit because she
> objected to the termination and did not believe Ms.
> Guyton's job performance was substandard. The record
> suggests Exact intentionally kept the affidavit away from
> Ms. McDonald and submitted the false, unsigned affidavit
> to the EEOC in the hope that the EEOC would believe that
> Ms. Guyton's supervisor found her work to be substandard
> and so Exact could try to justify how and why it
> terminated Ms. Guyton without complying with its
> Corrective Action Policy.

(Doc. 32 at 10)(footnote omitted). Ms. Guyton adds that,
although Exact now states that Mr. Alcon made the decision to
terminate her employment, Mr. Alcon did not provide that
information to the EEOC in his affidavit. Ms. Guyton asserts
that "[i]nstead, Exact submitted an unsigned affidavit from a
person they [sic] knew was not the decision maker (Ms. McDonald),
and told the EEOC she was the decision maker." Id. at 11. On
this basis, Ms. Guyton argues that Exact's conduct was
intentional.

In this case, Ms. Guyton sought discovery concerning Exact's
false statements to the EEOC. More specifically, during Ms.
Pannkuk's deposition, counsel for Ms. Guyton asked Ms. Pannkuk
questions about the false statements provided to the EEOC. Ms.
Pannkuk's counsel, also Exact's counsel, objected to the
questions and instructed Ms. Pannkuk not to answer them on the

-9-

grounds of attorney-client privilege.  In the motion to compel, Ms. Guyton argues, "[m]ost of the questions did not ask for attorney client communications.  Even if they did, the attorney client privilege should not apply to questions relating to the false statements made to the EEOC because of the crime-fraud exception." Id. at 12.  In addition to deposition testimony, Ms. Guyton also seeks written discovery, such as emails and other documents, about the allegedly false statements made to the EEOC.

The Court first examines whether the discovery sought in the motion to compel is protected by the attorney-client privilege. To the extent that the attorney-client privilege applies, the Court will examine whether Ms. Guyton is nonetheless entitled to the information based on the crime-fraud exception.

A. <u>The Attorney-Client Privilege</u>

Generally speaking, the parties dispute whether the attorney-client privilege protects the information sought in two categories of questions posed in Ms. Pannkuk's deposition.  The first category of questions relates to what actions Ms. Pannkuk took in response to the EEOC charge.  Ms. Guyton states:

- On page 19 of the deposition, the HR Manager was asked questions about Ms. Guyton's EEOC claim. She responded, without objection, to questions about whether she was asked to help respond to the EEOC claim and whether she was made aware of the claim. When asked to explain what Exact asked her to do to help respond to the EEOC claim, she was instructed not to answer.

    Q.   Okay.  Generally what were you asked to do?

         MR. EDWARDS:  Objection.  If you received instruction from counsel, I'm going to instruct you not to answer.

    Q.   Were you asked to search for documents?

         MR. EDWARDS: Objection. To the extent that you were receiving any instruction from counsel,

-10-

I'm instructing you not to answer.

Q.   I'm not sure that's privileged. I'm not asking
     for the communications, I'm just asking what
     you did, not what the substance of the
     communications were?

     MR. EDWARDS: I disagree.

Q.   Okay. So my question is, were you asked to
     search for documents?

     MR. EDWARDS:  Objection, instructing you not
     to answer.

                    * * *

Q.   Okay.  Were  you  asked  to  preserve  any
     documents?

     MR. EDWARDS: Objection. I'm going to instruct
     you not to answer.

                    * * *

Q.   Okay. Were you asked to review documents that
     were submitted to the EEOC?

     MR. EDWARDS: Objection. I'm going to instruct
     you not to answer.

                    * * *

Q.   Were you asked to interview any employees?

     MR. EDWARDS: Objection. I instruct you not to
     answer, again, if it's communications from
     counsel.

Q.   Are you not answering because of that?

A.   Correct.

(Doc. 32 at 18-19).  Ms. Guyton asserts that answers to these
questions would not be subject to the attorney-client privilege
because "a general description of the work performed is not

-11-

protected from disclosure....” Id. at 19.  Thus, Ms. Guyton
argues that instructing the witness not to answer these questions
was improper.

    Here, the record is unclear as to whether the information
sought was privileged.  That is, if Ms. Pannkuk’s answer to the
questions posed would have been that counsel asked her to search
for, preserve, or review documents, or to interview employees,
such communications would be protected from discovery by the
attorney-client privilege.  If, however, someone other than
counsel asked Ms. Pannkuk to search for, preserve, or review
documents, or to interview employees, those communications would
not be privileged.  In the latter instance, it would have been
improper to instruct Ms. Pannkuk not to answer.

    As to the second category of questions, Ms. Guyton states:

- On Page 68 of the transcript, specific questions
  were asked about Ms. Pannkuk’s EEOC affidavit.
  Exact’s HR Manager confirmed her affidavit was
  prepared by Exact’s outside counsel (who is Exact’s
  current trial counsel in this case.)  The witness
  confirmed the affidavit was sent directly to her
  from that outside counsel.  The next question goes
  to the heart of how and why false statements
  existed in her affidavit.  Ms. Pannkuk was asked
  whether she provided information for the affidavit
  or whether the lawyers provided her with the
  affidavit.

      Q.   Okay.  Did you provide them with information
           to put in there or did they provide you with
           the affidavit first?

      Mr. Edwards: Objection, instruct you not to
      answer.

                        * * *

- On pages 107-108 of the deposition transcript, the
  HR Manager was asked specific questions about the
  false statements in her affidavit. Ms. Pannkuk
  already testified that she did not make any changes

to the affidavit. Pannkuk depo at 68. This raises an inference that the false statements were in the affidavit when it was presented to her for her signature. As a result, the deposition questions focused on whether the lawyers put the false statements in the affidavits and whether the lawyers knew they were false. The witness was either instructed not to answer or coached on how to answer with speaking objections:

Q.   Okay. When you were asked to respond and sign an affidavit for the EEOC claim, did the lawyers you were communicating with know that you did not make the decision to terminate?

     MR. EDWARDS: Objection, calls for speculation. I'm going to instruct you not to answer to the extent it requires you to provide information communicated between you and the attorneys. Go ahead if you can.

A.   I don't know.

Q.   Okay. Your affidavit says that you made the decision to terminate Carrie Guyton, correct?

A.   Yes. As I mentioned, it should have said agreed.

Q.   Okay. Did the lawyers know that that statement was not accurate?

     MR. EDWARDS: Objection. Again, you can't testify for the attorneys.

A.   I don't know.

Q.   Okay. How did that statement get into your affidavit?

     MR. EDWARDS: Objection. Go ahead, if you know.

A.   I don't know.

Q.   Did you tell the lawyers that Harry Merkin or Mitch Alcon made the decision?

     MR. EDWARDS: Objection. Don't answer that

-13-

question.

Q.  I'd like you to answer the question.

    MR. EDWARDS: Don't answer the question.

A.  As I've been instructed by my attorney, I will
    not answer the question.

Q.  Okay. Were there any discussions with the
    lawyers about how to explain who made the
    determination to terminate Carrie Guyton?

    MR. EDWARDS: Objection. Do not answer that
    question, I'm instructing you not to answer.

Id. at 19, 20-21.  Ms. Guyton argues "[t]hese questions go to the
heart of the criminal act of submitting a false, sworn statement
to the EEOC."  Id. at 21.  Ms. Guyton further asserts that the
objections were inappropriate and that Ms. Pannkuk's counsel, who
also represents Exact, may have a conflict of interest.

    This Court disagrees and finds that Ms. Pannkuk's counsel
properly objected to the questions and instructed Ms. Pannkuk not
to answer.  As an initial matter, the questions concerning who
provided the information in Ms. Pannkuk's affidavit are improper.
In United States v. University Hospital, Inc., 2007 WL 1665748
(S.D. Ohio June 6, 2007)(Black, M.J.), the Court considered
whether the plaintiff should be permitted to ask a witness about
"the evolution of his affidavit," which included "specific
questioning as to: who prepared the affidavit, what the proposed
changes were, any communications between [the witness] and
whomever helped prepare the affidavit, and the contents of all
drafts of the affidavit."  Id. at *1.  The defendant maintained
that such an inquiry was barred by the attorney-client privilege
and the work product doctrine.  In examining the issue, the Court
stated that it was unaware "of any case in which a court has
permitted opposing counsel to question a witness about any role

-14-

that counsel may have had in the evolution of an affidavit, about any communications with counsel relating to an affidavit, or about prior undisclosed drafts of an affidavit." Id.  The Court further noted that "courts have routinely rejected such inquiries as violative of the attorney client privilege." Id., citing Ideal Elec. Co. v. Flowerserve Corp., 230 F.R.D. 603 (D. Nev. 2005); Renner v. Chase Manhattan Bank, 2001 U.S. Dist. Lexis 17920 (S.D.N.Y. 2001); EEOC v. Johnson & Higgins, Inc., 78 Fair Empl. Prac. Cas. (BNA) 1127 (S.D.N.Y. 1998); Folger v. Adam Co. v. PMI Indus., 1989 U.S. Dist. LEXIS 13906 (S.D.N.Y. 1989); Hudson v. General Dynamics Corp., 186 F.R.D. 271, 276 (D. Conn. 1999); Hewes v. Langston, 848 So.2d 800 (S. Ct. Mass 2003), withdrawn and superseded on denial of rehearing in 853 So.2d 1237 (2003).  In a footnote, the Court added that the work product doctrine also makes such information immune from discovery. Id. at n.1, citing Hickman v. Taylor, 329 U.S. 495, 510-11 (147); In re Powerhouse Licensing, LLC, 441 F.3d 467, 474 (6th Cir. 2006). Here, the questions about "the evolution of [the] affidavit" are just the type which the Court found to be improper in University Hospital, Inc., 2007 WL 1665748.  This Court agrees with reasoning in University Hospital, and it is unaware of any decision in which the Court determined the discovery of that information to be proper.  Thus, Ms. Pannkuk's counsel properly objected and instructed her not to answer the questions on the basis of attorney-client privilege.  In addition, the questions about the attorneys' knowledge call for speculation and, to the extent that an answer would reveal communications between Ms. Pannkuk and her attorneys, they seek information protected by the attorney-client privilege.  Similarly, the questions directly inquiring about communications between Ms. Pannkuk and her attorneys are clearly subject to protection under the attorney-client privilege.

Ms. Guyton asserts that, even if such information is subject to the attorney-client privilege, the crime-fraud exception to the privilege applies.  The Court now examines Ms. Guyton's claim that the discovery sought is not protected by privilege because the crime-fraud exception applies.

## B. The Crime-Fraud Exception

The crime-fraud exception applies to communications between an attorney and client which are "intended in some way to facilitate or to actively conceal a crime or fraud." Sutton v. Stevens Painton Corp., 193 Ohio App.3d 68, 96, 951 N.E.2d 91 (Cuyahoga Co. App. 2011).  The traditional two-prong test for invoking the crime-fraud exception requires the party claiming its applicability to produce evidence that "(1) the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; and (2) ... the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." Safety Today, Inc. v. Roy, 2013 WL 5597065, at *6 (S.D. Ohio Oct. 11, 2013) (internal quotations and alterations omitted).  The party claiming that the crime-fraud exception applies need not prove it applies by a preponderance of the evidence.  Rather, "[a] party invoking the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a crime or fraud has been committed and that the communications were in furtherance of the crime or fraud." State ex rel. Nix v. Cleveland, 83 Ohio St.3d 379, 384, 700 N.E.2d 12 (1998).

In Nix, the Ohio Supreme Court drew a dividing line between communications which further a fraud and those which merely relate to it, noting that "[t]he mere fact that communications may be related to a crime is insufficient to overcome the attorney-client privilege." Id.  As the court noted in Sutton v. Stevens Painton Corp., 193 Ohio App.3d at 75-76, "a communication

-16-

is not subject to disclosure merely because it contains relevant information that may help to prove that a crime or fraud occurred." Id. Further, it does not matter whether the attorney had knowledge of the crime or fraud or intended to facilitate or conceal it; "[t]he pertinent intent is that of the client, not the attorney." In re Omnicom Group, Inc. Securities Litig., 233 F.R.D. 400, 404 (S.D.N.Y. 2006). Finally, as this Court has noted, the crime-fraud exception encompasses more than fraud or crimes:

> Ohio courts have, and will continue to, analyze wrongful conduct not strictly falling into the category of either crimes or frauds on a case-by-case basis to determine if the conduct involves similar elements of malicious or injurious intent and deliberate falsehood. If it does, there is no reason why the law should prevent disclosure of the role an attorney may have played in assisting his or her client to commit that type of act, which itself has no social value.

Safety Today, 2013 WL 5597065, at *5. Thus, depending upon the particular facts of the case, included within the exception may be communications which are intended to further wrongful conduct. See Sutton, 193 Ohio App.3d at 75, 951 N.E.2d 91.

Here, Ms. Guyton argues that the crime-fraud exception applies because "[p]roviding false statements to the EEOC violates federal criminal statutes in 18 U.S.C. 1001 (providing false statements to a federal agency) and for Ms. Pannkuk's affidavit, 18 U.S.C. 1621 prohibits perjury in an affidavit." (Doc. 32 at iv). While there appears to be no dispute that those statutes could trigger an application of the crime-fraud exception, the issue is whether those statutes are applicable to the facts of this case.

Both of the statutes relied upon by Ms. Guyton have an intent element. The first statute relied upon by Ms. Guyton, 18 U.S.C. §1001, provides, in pertinent part:

-17-

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowing and willfully –

>    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

>    (2) makes any materially false, fictitious, or fraudulent statement or representation; or

>    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years....

<u>Id</u>. The second statute, 18 U.S.C. §1621, provides:

Whoever —

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorized an oath to be administrated, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

<u>Id</u>. Thus, Ms. Guyton bears the burden of producing evidence sufficient to warrant probable cause to believe that Ms. Pannkuk or Exact possessed the requisite intent to defraud the EEOC or willfully provide false testimony.

-18-

Here, there is no evidence to demonstrate that Ms. Pannkuk had actual knowledge of the falsity of the statements in her affidavit.  To the contrary, Ms. Pannkuk testified in her deposition that she did not correct the misstatement in her affidavit because she "was probably busy and read through it, signed it and returned it." (Doc. 30, Ex. 2 at 76).  Thus, Ms. Pannkuk contends that providing false information in her affidavit was inadvertent, and not intentional.  With no additional evidence concerning Ms. Pannkuk's intent, the Court finds that her explanation is plausible and that Ms. Guyton has not produced evidence establishing probable cause to believe that Ms. Pannkuk possessed the requisite intent to defraud the EEOC or willfully provide false testimony.

Similarly, Exact's decision to provide the EEOC with Ms. McDonald's unsigned affidavit, despite its containing false statements, is alone insufficient to warrant application of the crime-fraud exception to the attorney-client privilege.  In its opposition to the motion to compel, Exact explains:

> At the time Exact submitted its position statement to the EEOC, Ms. McDonald was away from the office on maternity leave.  Exact elected to submit Ms. McDonald's affidavit to the EEOC unsigned with the intention of supplementing an executed affidavit at a later time.  Unfortunately, this did not happen.

(Doc. 33 at 9)(citation omitted).  There is no question that the decision to submit an unsigned affidavit is not a preferred method of practice.  However, such an affidavit is of limited, if any, evidentiary value.  As the Eighth Circuit has observed, "an 'unsigned affidavit' is a contradiction in terms" because "[b]y definition an affidavit is a sworn statement in writing made ... under oath or on affirmation before ... an authorized officer." Mason v. Clark, 920 F.2d 493, 495 (8th Cir. 1990).  Although Exact should have supplemented an executed affidavit, which it

implies would have corrected the misstatements, its failure to do so does not constitute evidence that it possessed the requisite intent to defraud the EEOC by making materially false statements. Given that the unsigned affidavit has no evidentiary value, it is open to question whether it was a document that could have had any effect on the EEOC proceedings.  Based on the foregoing, Ms. Guyton has failed to satisfy her burden of producing evidence sufficient to warrant probable cause to believe that Exact violated 18 U.S.C. §1001.  Consequently, the crime-fraud exception does not apply.

Having so found, this Court still agrees with Ms. Guyton that Exact and its counsel were less than forthcoming about who made the decision to terminate her employment and improperly submitted statements and an affidavit containing false information to the EEOC.  There is no question that Exact and its counsel could have been more thorough in their fact-finding efforts and should have confirmed that the affidavits were correct before submitting them to the EEOC.  In finding that the crime-fraud exception does not apply, the Court is applying the law concerning that exception to the attorney-client privilege but not condoning the approach taken by Exact and its counsel in responding to the EEOC charge.

### III. Conclusion

For the reasons set forth above, the motion for leave to file a sur-reply instanter is granted (Doc. 40), and the motion to compel is granted in part and denied in part (Doc. 32).  More specifically, to the extent that they pertain to communications with someone other than counsel, the  questions in Ms. Pannkuk's deposition which relate to her being asked to search for, preserve, or review documents, or to interview employees are proper, and her answers are not protected by the attorney-client privilege.  Consequently, the motion to compel that information

-20-

is granted, and Ms. Pannkuk shall provide answers to those questions in a reconvened deposition or otherwise.  The remainder of the motion to compel is denied.

## IV. Procedure on Objections

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5.  The motion must specifically designate the order or part in question and the basis for any objection.  Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.3.


/s/ Terence P. Kemp
United States Magistrate Judge

-21-