**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **CARRIE GUYTON,** | : | |
| | : | **Case No. 2:14-CV-502** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Kemp** |
| | : | |
| **EXACT SOFTWARE NORTH AMERICA,** | : | |
| | : | |
| **Defendant.** | : | |

**OPINION & ORDER**

This matter is before the Court on the Amended Motion for Summary Judgment of

Defendant Exact Software North America ("Exact").  (Doc. 46.)  The Court **DENIES** the Motion

for Summary Judgment on Plaintiff's age-discrimination claim.  Because Plaintiff has abandoned

her sex-discrimination claim and concedes as much, the Court **GRANTS** the Motion for

Summary Judgment on that claim.

**I.      BACKGROUND**

**A.  Factual Background**

*1.  Plaintiff's Employment with Exact*

Carrie Guyton worked for Exact, a software company, and its predecessor, Macola, for a

total of 25 years until she was fired on June 7, 2010.  (Deposition of Carrie Guyton, Doc. 35 at

38-40.)  From 2004 until her termination she was a channel marketing manager at Exact.  (*Id.* at

44.)  In this position, she worked with the company's 70 channel partners, or re-sellers, who sold

Exact's software to customers, known as end users.  (*Id.* at 44-45.)  Guyton's role was to help the

channel partners with their marketing needs.  (*Id.* at 45.)  Norah McDonald was her supervisor

1

for approximately the last two years of her employment with Exact.  (*Id.* at 46-47; Deposition of Norah McDonald, Doc. 30-1 at 16.)

Beginning in 2008, Guyton also began managing user groups, groups of end users that Exact convenes to discuss issues with the software and provide feedback to Exact to improve its products.  (Guyton Dep., Doc. 35 at 47-48.)  User groups are essential to Exact's success because they enable the company to maintain and strengthen relationships with buyers.  (Deposition of Leslie Pannkuk, Doc. 30-2 at 30.)  Guyton managed 18 user groups, each of which had a president who was the point person for Guyton's communication with the group.  (Guyton Dep., Doc. 35 at 49-50.)  The presidents of the individual groups also participated in a presidents' group, the Exact User Community Presidents Council.  (*Id.* at 50.)  Ann Roos Hayner served as the president of the Council during this time period.  (*Id.*)

In 2008 and 2009, Guyton received positive performance evaluations.  In 2008,[1] she received an overall rating of "exceeded expectations," which appears to be the second highest possible rating.  (December 2008 Performance Review, Doc. 39-8 at 1.)  In the subcategories of functional competencies and objective criteria, she received one "greatly exceeded expectations," seven "exceeded expectations," and five "met expectations."  (*Id.* at 1.)  McDonald, her supervisor, wrote that Guyton "has built a solid communication path with channel partners," that her "flexibility is unmatched—always willing to lend a hand, take on extra workload and not hesitating to work with any stakeholder . . . to get a project or initiative done on time," and that she had an "unwavering" commitment to teamwork.  (*Id.* at 2.)

---

[1] The review took place on March 12, 2009.  (Doc. 39-8 at 2.)

In 2009,[2] Guyton's ratings were even more favorable.  (December 2009 Performance Review, Doc. 39-7 at 1-2.)  She received seven ratings of "exceeded expectations" and three of "met expectations."  (*Id.* at 1.)  McDonald described her as a "valued asset" to the marketing team, praised her flexibility and commitment to teamwork, and called her "highly organized" and "focused."  (*Id.* at 2.)  She also noted that Guyton had achieved the goals that she had set the previous year and took on additional unanticipated responsibilities.  (*Id.*)  McDonald later testified that the following feedback in Guyton's evaluation, attributed to "one of the user group presidents," was provided by Hayner:  "We know Carrie[;] she's great and very helpful."  (*Id.* at 2; McDonald Dep., Doc. 30-1 at 39-40.)

In addition to her two most recent evaluations, the two preceding reviews, completed by her previous manager, Lynn Smith, contain glowing comments about Guyton's performance, including her teamwork, communication skills, and attitude.  (*See* Docs. 39-10, 39-11.)  Guyton never received any write-ups for performance issues.  (Guyton Dep., Doc. 35 at 152.)

There is a significant amount of testimony in the record from former Exact supervisors and managers that Plaintiff's work performance in the years preceding her termination was strong.  For example, McDonald, her supervisor, testified that she was "collaborative," "easy to work with," "well liked," and "a good asset . . . with a lot of institutional knowledge." (McDonald Dep., Doc. 30-1 at 14-15.)  The only time McDonald could recall having to reprimand Guyton in the two years she supervised her was on one occasion when there was an error on the plaque of a trophy that Exact awarded to Ann Hayner.  (*Id.* at 16-17.)  Guyton mistakenly printed Hayner's maiden name (Ann Roos) instead of her married name (Ann Hayner) on the plaque.  (*Id.* at 17; Guyton Dep., Doc. 35 at 158-60.)

---

[2] The review took place on February 12, 2010, less than three months before Guyton was notified of her termination.  (Doc. 39-7 at 1.)

3

Rebecca Cole, a former human resources manager at Exact who worked with Guyton for three or four years in the company's Columbus office, described Guyton as "well respected not only with her group, the marketing group, in Columbus." (Deposition of Rebecca Cole, Doc. 38-1 at 75.) She could not recall any complaints about Guyton's performance or any comments that were not positive. (*Id.* at 75-76.) Cole was never responsible for formally evaluating Guyton. (*Id.* at 77.) Doris Dunn, who worked closely with Guyton for 10 years on several projects until Vice President of Marketing Harry Merkin fired Dunn in 2007, described Guyton as "always the first one [in the office] and usually the last one there. . . . because she wanted to do the job and do it right." (Deposition of Doris Dunn, Doc. 51-1 at 34, 38, 41.) Dunn characterized her as caring deeply about her performance, paying attention to detail, and completing tasks in a timely manner. (*Id.* at 42-45.) She said that the channel partners with whom Guyton worked had a "great respect" for her and that Guyton also had a good working relationship with the user groups. (*Id.* at 45, 49.)

### 2. Ann Hayner's Complaints About Plaintiff

In March 2010, Merkin asked Plaintiff to manage and coordinate Exact's 2010 tradeshow, the Engage User Event ("Engage"). (Guyton Dep., Doc. 35 at 152-53.) The Engage event, which took place in April 2010, is Exact's annual conference for its end users. (*Id.* at 118; Deposition of Ann Roos Hayner, Doc. 34 at 62.)

On April 14, 2010, at the end of the dinner on the last day of the Engage conference, Hayner approached Merkin to express "some frustration to [him] about Carrie's performance." (*Id.* at 109-10; *see also* Deposition of Harry Merkin, Doc. 30-3 at 16.) Although Hayner later testified that she could not recall the details of the conversation, Merkin characterized Hayner's comments as "[v]ery strong negative feedback." (*Id.*) According to Merkin, Hayner detailed a

4

number of "electronic communications that . . . were mishandled, which resulted in embarrassment, missed opportunities for meetings to be successful, mailing-list issues[,] those types of things." (*Id.* at 16-17.) Hayner verbally described the mistakes but did not give written copies to Merkin. (*Id.* at 17; Hayner Dep., Doc. 35 at 152.) She further faulted Guyton for her "lack of responsiveness and persisten[ce]" although did not describe instances when she had noticed these shortcomings. (Merkin Dep., Doc. 30-3 at 17.) Hayner later testified that Guyton's lack of attention to detail "made [her] job much harder because [she] had to proofread everything very carefully to catch problems." (Hayner Dep., Doc. 34 at 43.)

Exact has submitted to the Court the offending emails, all of which Guyton concedes that she authored. (*See* Docs. 43-5-14; Guyton Dep., Doc. 35 at 102-13, 123-47.) Exact's submission includes five emails with a variety of mistakes such as typos, misspellings, an incomplete sentence, a presenter's name written as Marty rather than Mary, an incorrect date of the week, and an incorrect email address. (*See* Docs. 43-5-14.) Four of the five emails were sent to Hayner in draft form and corrected before Guyton sent them to their intended recipients. (*Id.*) In addition to the five emails with typos and mistakes, Exact also submitted an email from Hayner to Guyton complaining about a typo on Exact's website, but Guyton has testified that only Exact's webmaster was authorized to make changes to material on the website and it is not clear that she was responsible for the typo, although Hayner believed that she may have had a hand in transmitting incorrect information to the webmaster. (Guyton Dep., Doc. 35 at 269; Hayner Dep., Doc. 34 at 170-71.) One additional email referred to Hayner's frustration about a technical issue that certain emails did not reach intended recipients. (*Id.* at 167.) There is no indication that Guyton was responsible for these types of technical problems. (*Id.* at 167-68; McDonald Dep., Doc. 30-1. at 21.) Finally, Hayner also complained to Guyton in one email

about a faulty recording of a meeting, but she acknowledged in her deposition that Guyton was not responsible for the technical glitches with the recording.  (Hayner Dep., Doc. 34 at 169-70.)

### 3. Plaintiff's Performance Improvement Plan and Termination

After speaking with Hayner, Merkin immediately contacted McDonald.  (Merkin Dep., Doc. 30-3 at 18.)  Although they did not make any decisions immediately, Merkin characterized McDonald as "alarmed and concerned" about Hayner's feedback.  (*Id.*)  Merkin testified that a few days later, he and McDonald "talked about the performance plan and the steps moving forward after that" and that McDonald agreed that Guyton should be placed on a performance plan that would ultimately lead to termination.  (*Id.* at 19.)  On April 21, 2010, Merkin emailed Mitchell Alcon, Exact's Chief Executive Officer, recommending that Guyton be placed on a 60-day performance plan beginning on Thursday, April 22, 2010.  (*Id.* at 24; Email from Harry Merkin to Mitchell Alcon, Doc. 43-17 at 2.)  The email stated that Merkin had received "overwhelming negative feedback from the User Community Presidents group," referring to Hayner's complaints.  (*Id.* at 2; Merkin Dep., Doc. 30-3 at 25.)  Before laying out his recommendation in his "Headcount Plan Part II" to fire Guyton and one other employee, Kathryn Scholl, Merkin explained to Alcon in the first part of his "HeadCount Plan" that he hoped to "utilize Peter Means as team lead/owner of social media plan and execution" and "[h]ire Danielle Bourke as a full time Exact employee."  (Email from Harry Merkin to Mitchell Alcon, Doc. 43-17 at 2.)  He noted that "[i]n order to retain Peter and hire Danielle, we must open two headcount on the marketing team," which he proposed to do by terminating Guyton and Scholl. (*Id.*)  He also told Alcon that he had discussed this plan with Leslie Pannkuk, Exact's Human Resources Director for North America.  (*Id.* at 1.)

6

Alcon responded by email, stating "I agree with everything you have outlined," and "I would go down the counseling-out route for [Guyton and Scholl] because it's going to cost us more waiting."  (*Id.*; Merkin Dep., Doc. 30-3 at 26.)  Merkin explained that the "counseling-out route," a term Alcon used frequently, referred to a plan to have a conversation with an employee to explain that she does not have a future with the company and she could either quit or be terminated.  (*Id.* at 27-28.)  Although Merkin did not mention McDonald in his email, Alcon testified that it was his understanding that Merkin, McDonald, and Pannkuk were all involved in the recommendation from Merkin to Alcon.  (Deposition of Mitchell Alcon, Doc. 31-1 at 14-15.)

Merkin decided that after Guyton's departure, Danielle Bourke, who at the time was working as a contract employee, primarily to plan and execute the Engage conference, would become a full-time employee and assume all of Guyton's responsibilities with both channel partners and end users.  (Merkin Dep., Doc. 30-3 at 23-24, 28-29.)

McDonald vigorously disputes this account.  She says that she spoke with Hayner at the Engage conference after her conversation with Merkin about Guyton's email mistakes, and Hayner told her "I don't want Carrie to lose her job or anything like that; but I just wanted to talk to you about it as her manager so that it does not happen again."  (McDonald Dep., Doc. 30-1 at 46.)  McDonald told Hayner she would address the issues with Guyton, and she did talk to Guyton about the errors.  (*Id.* at 46-47.)  McDonald testified that she voiced her opposition to Merkin's decision to terminate Guyton to both Merkin and Pannkuk but that Pannkuk told her it was her job as a manager and she had to do it.  (*Id.* at 48-49; 52.)

On April 22, 2010, McDonald and Leslie Pannkuk informed Guyton that her employment would be terminated due to performance issues, effective June 7, 2010.  (Guyton Dep., Doc. 35

at 156, 162-65; McDonald Dep., Doc. 30-1 at 53-54.)  Guyton was 51 years old when she was

fired.  (EEOC Charge, Doc. 46-4.)  Merkin was 52 at the time.  (Merkin Dep., Doc. 30-3 at 82.)

Pannkuk submitted an affidavit in this litigation describing the steps that led to the

termination, stating that "Ms. McDonald and I decided to terminate Ms. Guyton's employment."

(Affidavit of Leslie Pannkuk, Doc. 41-1, Ex. A at ¶ 17.)  Pannkuk later testified in her deposition

that she erroneously used the word "decided" and meant instead to use the word "agreed."  (Doc.

30-2 at 75-76.)  She also stated in the deposition that Alcon had made the decision regarding

termination, which Alcon corroborated in his deposition.  (*Id.* at 40; Alcon Dep., Doc. 31-1 at 7-

8.)  Alcon recalled that he made his decision after receiving recommendations from McDonald,

Merkin, Pannkuk, and Exact's legal department.  (*Id.* at 8, 10.)  Merkin stated that he ultimately

made the decision to make a recommendation to Alcon that Guyton be terminated.  (Merkin

Dep., Doc. 30-3 at 81.)  When asked by the EEOC to submit the name of "the person" who made

the recommendation for termination, however, Exact identified Norah McDonald but not Merkin

or Pannkuk.  (10/18/12 Letter to EEOC, Doc. 33-12 at 1-2.)

Exact had a Corrective Action Policy in place at the time that Guyton was terminated.

(Doc. 39-14.)  Exact "reserve[d] the right to 'skip' any of the corrective action steps."  (*Id.* at 1.)

The Policy identifies three types of concerns that could result in disciplinary action: (1)

performance of duties and responsibilities; (2) behavioral issues; and (3) critical incidents.  (*Id.* at

1-2.)  The Policy notes that in some cases, a critical incident will "result[] in immediate

corrective action, up to and including termination of employment."  (*Id.* at 2.)  The Corrective

Action Policy incorporates by reference the Business Ethics, Gift, and Conduct Policy, which

lists examples of "critical incidents" that may trigger immediate discharge.  (Doc. 39-16 at 2-3.)

These critical incidents include conduct ranging from unauthorized possession of company

property, fighting at work, and falsifying company records to more general violations such as "[s]ubstandard work, negligence in the performance of duties, sleeping on premises during work hours" and "[f]ailing to meet Company work standards in terms of quality and quantity." (*Id.*)

Although it reserves the right to skip any of the corrective action steps, the Corrective Action Policy states that the "first steps for any concern with performance or behavioral issues is to verbally coach, counsel and teach, citing the specific areas of improvement needed to effectively execute the duties and responsibility of the job." (Doc. 39-14 at 2.)  If the employee's performance does not improve, the supervisor will create a Level 1 Counseling Report to address the issue, along with an Improvement Plan "defining what is expected, how it should be accomplished and in what time frame." (*Id.*)  If the employee "does not respond to the Level 1 Counseling Report," the next step is a Level 2 Counseling Report. (*Id.*)  The Policy further provides that "if the incident is of a critical nature with serious potential for negative impact on the organization," the documentation process may begin at Level 2. (*Id.*)  Finally, the Policy states that disciplinary termination will occur under certain circumstances, including "[f]ailure to meet expectations and goals set forth in a performance improvement plan"; "[f]ailure to make necessary changes in work-related personal behaviors"; and "[p]articipating in a critical incident, either a first-time offense of a serious nature, or a repeating occurrence of incidents with potential for negative impact." (*Id.* at 3.)  Severance pay is not offered to employees terminated for disciplinary reasons. (*Id.*; *see also* Cole Dep., Doc. 38-1 at 77-78 (noting that a terminated employee would never receive an offer of severance).)  In such a case, employees' "access to systems" at Exact is immediately discontinued and the employee and manager make arrangements to meet for the employee to collect her personal property "to minimize impact on the work environment." (Doc. 39-14 at 3.)

Before Exact terminated Guyton, she received no Level 1 or 2 Counseling Report. (Pannkuk Dep., Doc. 30-2 at 70.)  McDonald testified that she did give Guyton verbal counseling after Hayner's complaints.  (McDonald Dep., Doc. 30-1 at 55-56.)  Pannkuk testified that Guyton's "performance issues, such as typos and electronic mail issues, constituted substandard work and failure to meet company work standards in terms of quality and quantity as outlined in Exact's ethics and standards of conduct policy."  (*Id.* at 74; Pannkuk Aff., Doc. 41-1, Ex. A at ¶ 16.)

Guyton continued to work at Exact for approximately six weeks after she received notice of her termination; her access to Exact's systems was not terminated during this time period. (McDonald Dep., Doc. 30-1 at 61; Guyton Dep., Doc. 30 at 178.)  Additionally, Pannkuk stated that Guyton received an offer of severance from Exact, which she rejected, although Guyton says she did not receive a severance offer.  (Pannkuk Dep., Doc. 30-2 at 60; Guyton Dep., Doc. 35 at 179-80.)  Exact typically made use of a standard form explaining why an employee was terminated or otherwise separated from employment, but it was not able to produce such a document in discovery indicating that it had done so for Guyton's termination.  (Pannkuk Dep., Doc. 30-2 at 57; *See* Doc. 41-1, Pl.'s Dep. Ex. 27 at D000275.)  There is no indication, however, that it was an official Exact policy to use this form.  Former human resources manager Dunn testified that during her time at the company she had seen other people with numerous typos in their emails but no one besides Guyton got fired for this offense.  (Dunn Dep., Doc. 51-1 at 49-50.)

On April 23, 2016, the day after Guyton was notified of her termination, Exact sent an letter to Danielle Bourke offering her the position of marketing manager.  (*Id.* at 52; Doc. 41-1, Pl.'s Dep. Ex. 22 at D000263.)

Hayner testified that when Bourke was responsible for managing user groups, there were still technical problems with emails, electronic meetings, and other communication, and Plaintiff has submitted copies of email messages between Bourke and Hayner documenting these issues. (Hayner Dep., Doc. 34 at 209-10; 213-14; 215-19; *see also* Doc. 34-1 at Exs. 118-19, 122, 124-25, 128, 130.)  Several emails from Bourke to Hayner, some of which were also circulated to a wider audience, contained typos.  (*See* Doc. 34-1 at Exs. 100-06, 138.)  Finally, there are a number of emails in the record from 2010 to 2011 reflecting complaints about Bourke from other user group presidents.  (*See, e.g.*, Doc. 34-1 at Exs. 122, 131-33, 136, 142, 148.)  For example, one user group president complained that Bourke "was missing a lot of details" and doesn't take feedback well, another asked Hayner if "any other user group presidents are still having concerns with Danielle not following through on our requests," and a third complained he had tried to reach Bourke for two weeks by email and received no response.  (*Id.* at Exs. 148, 142, 136.)

### 4.  Alleged Discriminatory Comments

During discovery, Plaintiff elicited testimony regarding various allegedly discriminatory comments from members of Exact's management team.  First, former human resources manager Cole testified that at an Exact global human resources meeting in May of 2010, she saw Pannkuk give a presentation on employee benefits, which Pannkuk also planned to offer in the United States at a later date.  (Cole Dep., Doc. 38-1 at 34-35.)  Cole recalled one aspect of the presentation stuck out in her mind because she was "so shocked."  (*Id.* at 39.)  Pannkuk discussed that the company was changing its benefits plan "because of the aging workforce" and "higher medical costs" of older workers.  (*Id.*)  In her deposition, Pannkuk acknowledged that in that presentation she discussed that "the workforce in America is older and causing health insurance premiums to rise."  (Pannkuk Dep., Doc. 30-2 at 81.)

11

Cole also recalls that she was in a meeting at Exact in which senior managers made comments about the closing of Macola's office in Marion, Ohio after Exact bought Macola, and the opening of the new Exact office just north of Columbus.  (*Id.* at 40-41.)  She stated that these unidentified individuals said that they moved the office to Columbus "in hope that all [the older workers] would leave."  (*Id.* at 41.)

McDonald also testified that she participated in a conference call of Exact managers, the date of which she could not recall, in which there was a discussion that employees at Exact were generally older.  (McDonald Dep., Doc. 30-1 at 75.)  She also recalled other meetings in which managers discussed the costs to the company of high health insurance premiums due to the older workforce.  (*Id.* at 76.)  She remembered that Pannkuk in particular gave a presentation on this subject matter.  (*Id.* at 77.)  She recalled being "very surprised" at the subject matter of the presentation because she thought it implied that managers should consider the age of employees when making hiring decisions.  (*Id.* at 81.)  Afterward, she said there was "water-cooler talk" from other employees, the gist of which was that people were surprised age was discussed openly in that context.  (*Id.* at 82.)

### 5.  *EEOC Investigation*

Guyton filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 6, 2010.  (Doc. 46-4.)  As part of the EEOC investigation, Exact submitted the aforementioned affidavit from Pannkuk stating that she and McDonald decided to terminate Guyton, as well as an unsigned affidavit from Norah McDonald.  (Affidavit of Leslie Pannkuk, Doc. 32-1, Ex. A; Affidavit of Norah McDonald, Doc. 32-1, Ex. 3.)  McDonald later testified that she had not seen the affidavit when Exact submitted it and in fact saw it for the first time during her deposition in this matter.  (McDonald Dep., Doc. 30-1 at 90-

92.)  In its reply brief, as well as its earlier response to a motion to compel discovery, Exact acknowledged that it had submitted an unsigned affidavit from McDonald that she had never seen.  (Doc. 52 at 16; Doc. 33 at 9.)  Defendant notes that at the time, McDonald was out of the office on maternity leave and avers that it submitted the affidavit "with the intention of supplementing an executed affidavit at a later time," but that "[u]nfortunately, this did not happen."  (Doc. 52 at 16.)  In an October 18, 2012 response to a request for information from the EEOC, Defendant cited McDonald as the "person recommending [Guyton's] discharge."  (Doc. 39-6 at 1-2.)  Defendant also relied on McDonald's affidavit in written responses to discovery requests it submitted to the EEOC when it stated that McDonald had said that Guyton was terminated for "performances issues such as typos and electronic mail issues" and that her work was "substandard."  (Doc. 39-1 at 4.)

McDonald's affidavit stated, among other things, that Guyton's job performance revealed "performance issues such as typos and electronic mail issues," which constituted "substandard work" and "failu[ure] to meet Company work standards in terms of quality and quantity." (McDonald Aff., Doc. 32-1, Ex. 3 at ¶ 10.)  According to McDonald's affidavit, Pannkuk and McDonald decided to terminate Guyton's employment.  (*Id.* at ¶ 13.)  The affidavit also stated that Bourke did not replace Guyton in her position with the marketing department and only assumed Guyton's responsibilities for managing user groups but no other duties.  (*Id.* at ¶ 18.)  In her deposition, however, McDonald testified that the statements in the affidavit were untrue and that she in fact opposed the decision to terminate Guyton's employment, did not work closely with Pannkuk regarding Guyton's performance issues, and did not view Guyton's performance as constituting substandard work or failure to meet company standards.  (McDonald Dep., Doc. 30-1 at 94-95.)  She also testified that Bourke did replace Guyton.  (*Id.* at 95.)

### 6.  *Office of Unemployment Compensation Evidence*

After she left Exact, Guyton applied for unemployment insurance benefits.  (*See* Doc. 39-31.)  In its notice approving Guyton's benefits, the Ohio Office of Unemployment Compensation ("OUC") stated that Guyton "became separated from [Exact] due to a mutual agreement."  (*Id.* at 1.)  In her deposition, Pannkuk testified that this mischaracterization of the nature of the separation "could have" come from Exact's Human Resources department or from Guyton herself.  (Pannkuk Dep., Doc. 30-2 at 60.)

## B.  Procedural History

Plaintiff filed a complaint on May 27, 2014, alleging age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 630(g) ("ADEA") and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII").  (Compl., Doc. 1 at 2-5.)  She seeks compensatory damages, injunctive relief, punitive damages, and attorney fees and costs.  (*Id.* at 5-6.)  Defendant filed a motion for summary judgment.  (Doc. 46.)

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law."  *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir. 1993).  The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hospital,* 964 F.2d

577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III. ANALYSIS

#### A. Sex-Discrimination Claim

Plaintiff abandoned her sex-discrimination claim in her briefing on an earlier motion to compel and does not oppose the dismissal of this claim. Defendant's Motion for Summary Judgment on Plaintiff's sex-discrimination claim is **GRANTED**.

#### B. Age-Discrimination Claim

The ADEA prohibits an employer from discriminating against any individual because of her age. 29 U.S.C. § 623(a)(1). Plaintiff concedes that she has not introduced direct evidence of disparate treatment on the basis of her age. Therefore, the Court applies the burden-shifting framework for circumstantial evidence established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Although *McDonnell Douglas* was a Title VII race-discrimination case, the

Court analyzes age-discrimination claims under the ADEA under the same analytical framework as Title VII discrimination claims.  *Mitchell*, 964 F.2d at 582.

First, a plaintiff must make a prima facie case of age discrimination by showing that:  (1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was qualified for the job; and (4) she was replaced by a substantially younger employee or, for the same or similar conduct, was treated differently from a substantially younger employee.  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action.  *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).  After the defendant meets its burden, the plaintiff must then demonstrate that the defendant's explanation was pretext for discrimination.  *Id.*  Plaintiff bears the ultimate burden of persuasion to prove by a preponderance of the evidence that age was the 'but-for' cause of her termination.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

### 1.  Prima Facie Case

The parties do not dispute that Plaintiff was subjected to an adverse employment action when Exact fired her, or that she was over 40 years old.  Defendant argues, however, that Plaintiff cannot show that she was qualified for her position or that it replaced Plaintiff with, or treated her less favorably than, a similarly situated substantially younger employee.

### a.  Qualification Prong

Relying on two unpublished Sixth Circuit decisions, Defendant argues that Guyton's job performance did not meet its "legitimate expectations," thus rendering her unqualified for her

16

position.  *See Harris v. J.M. Smucker's Co.*, No. 98-6784, 2000 WL 658040, at *2 (6th Cir. May 8, 2000) (table); *Murphy v. Centerior Energy Corp.*, No. 93-4281, 1994 WL 573914, at *5-6 (6th Cir. Oct. 17, 1994).[3]  More recently, in *Wexler v. White's Fine Furniture, Inc.*, the Sixth Circuit, sitting en banc, considered this issue when a defendant argued that a plaintiff was unqualified for his position as a store manager because the store's sales were declining, which the defendant also proffered as its legitimate nondiscriminatory reason for terminating the plaintiff.  317 F.3d 564, 574 (6th Cir. 2003) (en banc).  The Sixth Circuit held that:

> [A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

*Id.* at 574-75; *see also Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie case of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."). In *Wexler*, the en banc court explicitly addressed the "legitimate expectations" line of cases and held that to meet the qualification prong of the prima facie case, a plaintiff must present "credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field."  *Id.* at 575-76.  Examples include "the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."  *Id.* at 576.

---

[3] Both the *Harris* and *Murphy* courts cited an earlier published Sixth Circuit case for the proposition that the qualification prong required that an employee meet his employer's "legitimate expectations."  *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990).  This proposition is likely no longer good law after *Wexler*, however, and in any event, *McDonald* is unlikely to control here because the plaintiff in that case conceded that he "was simply not performing to [the employer's] satisfaction."  *Id.*

Here, Exact urges the Court to do exactly what *Wexler* prohibits: rely on Exact's proffered legitimate nondiscriminatory reason for Guyton's termination—her typographical and other errors in email—to find that she has not met her burden to show that she is qualified for the position.  Instead, the Court's task is to examine Guyton's objective qualifications.  There is more than enough evidence before the Court that Guyton "continued to possess the *objective qualifications* she held when she was hired."  *Id.* at 575 (quoting *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991)).

Other than the errors for which Exact allegedly terminated Guyton, the company points to no other evidence of Guyton's lack of qualifications for the job.  Nor does it identify any testimony from other Exact employees or supervisors that Plaintiff was unqualified for the job. In its reply brief, Exact continues to maintain that Plaintiff has introduced no evidence of her qualifications but that is simply not the case.  Plaintiff does rely in part on testimony from former human resources managers Cole and Dunn, both of whom worked with Plaintiff earlier in her career but not during her final year at the company, but she has also pointed to her favorable evaluations and a good deal of testimony from various Exact employees, including McDonald, her direct supervisor at the time of her termination, that Plaintiff was trustworthy, easy to work with, worked hard, completed all tasks assigned to her, and possessed significant institutional knowledge.  Given her 25 years of experience in the industry, knowledge of Exact's products, established relationships with channel partners, and favorable performance evaluation a mere two months before her discharge, Plaintiff has more than met her burden to show that she was qualified for the marketing manager position.

b.  Similarly-Situated Prong

Plaintiff contends that Exact replaced her with Danielle Bourke, who was 33 years old at the time of Plaintiff's termination, or, in the alternative, that Exact treated her less favorably than Bourke.  There is no dispute that Bourke is substantially younger than Guyton, who was 51 when she terminated.  *See Grosjean*, 349 F.3d at 336.  But Defendant argues that Plaintiff has nevertheless failed to satisfy this prong of the prima facie case because, although Bourke absorbed all of Plaintiff's duties, she also maintained other duties that Guyton had never performed.

The Sixth Circuit has clarified that in a reduction-in-force case, a "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

Plaintiff contends that Defendant improperly urges the Court to import an analysis that is only germane to a reduction-in-force context into a case where the parties agree that there was no reduction in force.  (Doc. 50 at 23-24.)  Plaintiff is correct that earlier Sixth Circuit cases explaining the standard for replacement were reduction-in-force cases, in which plaintiffs have a heightened burden to meet the fourth prong of the prima facie case.  *See Barnes*, 896 F.2d at 1465 (holding that a plaintiff who is fired in a workforce reduction must present additional evidence "to indicate that the employer singled out the plaintiff for discharge for impermissible reasons").  But the Sixth Circuit subsequently cited the *Barnes* definition of replacement in a non-reduction-in-force case and made no distinction between reduction-in-force cases and others.  *Grosjean*, 349 F.3d at 336.

19

In a case subsequent to *Grosjean*, the Sixth Circuit held that there was a factual dispute as to whether a plaintiff was "replaced" by a particular employee even though he maintained some of his preexisting responsibilities while also assuming the plaintiff's because: (1) there was testimony from other employees, as well as company memoranda, that the employee replaced the plaintiff; (2) he continued to work about the same number of hours per week as before while assuming the plaintiff's responsibilities, suggesting that he also cut back on some of his own earlier responsibilities; and (3) he testified that his day-to-day schedule and responsibilities changed after the plaintiff's termination. *Pierson v. Quad/Graphic Printing Corp.*, 749 F.3d 530, 537-39 (6th Cir. 2014).

*Pierson* is instructive here. There is no dispute that Bourke's responsibilities changed significantly due to assuming Guyton's workload. McDonald, Guyton's supervisor, testified that Bourke had replaced Guyton. The email exchange between Alcon and Merkin indicates that Merkin recommended that Bourke replace Guyton and that Alcon also intended as such. Merkin explicitly acknowledged that in order to hire Bourke and another employee, Guyton and Scholl would need to be fired. Nor has Defendant offered any evidence that any other employee took over any of Guyton's responsibilities. This evidence is sufficient to establish at the very least a genuine issue of material fact as to whether Bourke replaced Guyton.

Moreover, this result is consistent with another post-*Barnes* case, *Tinker v. Sears, Roebuck & Co.*, which defined "replacement" as reassigning an existing employee to assume a discharged employee's duties in a way that "fundamentally change[s] the nature of his employment." 127 F.3d 519, 522 (6th Cir. 1997). In *Tinker*, the Sixth Circuit held that a part-time employee who was promoted to full-time employment effectively replaced a terminated employee because "this type of reassignment is analogous to hiring a new employee to cover the

terminated employee's duties." *Id.*  As a contract employee who was promoted to full-time status the day after Guyton was notified of her termination, Bourke's circumstances are closely analogous to the employee who replaced the plaintiff in *Tinker*.  *See also Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 372-73 (6th Cir. 1999) (noting that *Tinker* applied *Barnes* and therefore both cases are relevant to a determination of replacement status); *Rutherford v. Britthaven, Inc.*, No. 09-51-GFVT, 2010 WL 2228359, at *5 (E.D. Ky. June 2, 2010). Therefore, the Court finds that Plaintiff has satisfied the fourth prong of the prima facie case because she has shown that Bourke replaced her.

In the alternative, the Court also finds that there is a factual dispute as to whether Guyton was treated less favorably than Bourke, a similarly situated employee who is substantially younger.  Defendant takes issue with the notion that the two women are similarly situated, because they worked in different offices (Bourke in Boston, Guyton in Columbus), reported to different supervisors (Merkin and McDonald, respectively), and had distinct duties.  (Doc. 46 at 17.)  Moreover, there is no evidence that Hayner ever complained about Bourke's job performance as she did Guyton's.  (*Id.* at 17-18.)

Employees are similarly situated when they are similar "in all relevant respects."  *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 753 (6th Cir. 2008).  This standard does not require "exact correlation."  *Id.*  Indeed, the Sixth Circuit has clarified on more than one occasion that individuals need not have the same supervisor to be similarly situated.  *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 564 (6th Cir. 2013); *Bobo*, 665 F.3d at 751; *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479-80 (6th Cir. 2003) (noting that "the 'same supervisor' criterium" is not an "inflexible requirement").  And such a requirement would be illogical because it would essentially obviate the possibility of employer liability in a small department in which a

21

plaintiff's "job responsibilities are unique to his or her position" or only one or a few employees share a common supervisor.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998); *see also Louzon*, 718 F.3d at 564 (holding that a same-supervisor requirement would "render any plaintiff's burden virtually impossible" against the defendant because each supervisor managed "no more than a few individuals"); *Arnold v. City of Columbus*, 515 F. App'x 524, 532 (6th Cir. 2013).  Instead, in determining whether two employees are similarly situated "in all relevant respects," the Court's task is to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee."  *Louzon*, 718 F.3d at 563-64.

Nor do their different work locations weigh in favor of finding that Bourke and Guyton were not similarly situated.  In fact, after the Boston office, where Bourke worked, was closed, the work performed there was moved to other offices.  (Pannkuk Dep., Doc. 30-2 at 56.)  Although Defendant cites the different physical locations as a reason to find that the two employees were not similarly situated, the evidence in the case suggests that the responsibilities of a marketing manager did not require face-to-face interaction with staff in any particular office.  For instance, McDonald, Guyton's supervisor, worked in a different location than she did.

Given the weight of the evidence that Bourke assumed Guyton's duties, as discussed earlier in this section, the Court concludes that there is at the very least a genuine issue of material fact as to whether they are similarly situated.

Turning to the question of whether Bourke and Guyton were treated differently, the Court holds that Plaintiff has introduced evidence of different treatment sufficient to survive a motion for summary judgment.  There is evidence of numerous typos in Bourke's emails to Hayner, as well as technical issues and complaints from user group presidents about Bourke.  Guyton was

terminated for issues of this type while Bourke was not.[4]  A reasonable jury could conclude that Guyton and Bourke, the proposed comparator, "engaged in acts of comparable seriousness" but that only Guyton was terminated as a result.  *Bobo*, 665 F.3d at 751; *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (considering whether the plaintiff and the comparator "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it") (quoting *Ercegovich*, 154 F.3d at 352); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (holding that the plaintiff did not establish a prima facie case when his infraction was "qualitatively more serious" than those of his three coworkers because even though they all engaged in negligent conduct in recklessly driving their rigs, only his rig seriously injured a coworker).  Here, the mistakes of Bourke and Guyton were comparable in both kind and severity.

The Court finds that Plaintiff has established the fourth prong of the prima facie case by introducing evidence from which a reasonable jury could believe that she was replaced by Bourke and, in the alternative, was treated less favorably than Bourke.

### 2.  *Pretext*

Defendant's proffered non-discriminatory reason for firing Guyton is that she "was not performing her job with an appropriate level of skill and attention to detail," as represented to Merkin by Hayner.  (Doc. 46 at 18.)  The burden thus shifts back to Plaintiff to show that this explanation is pretext for discrimination.  A plaintiff may demonstrate pretext by showing that the proffered nondiscriminatory reason had no basis in fact, did not actually motivate the

---

[4] Bourke was eventually laid off, but not for performance reasons. Her job was eliminated after the Boston office was closed.  (Deposition of Danielle Bourke, Doc. 42 at 49-50; Pannkuk Dep., Doc. 30-2 at 56.)

employer's action, or was insufficient to motivate the adverse action.  *Harris v. Metro. Gov't of Nasvhille & Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).  The burden to show pretext requires a plaintiff only "to rebut, but not to disprove, the defendant's proffered rationale."  *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quotation marks and citation omitted).  The Sixth Circuit has said that "[t]he three-part test need not be applied rigidly.  Rather, pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?"  *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (internal quotation marks, citation, and alterations omitted).

Plaintiff argues that "[e]mail is a communication device that allows for prompt and efficient communication, in contrast to the more formal written method of commercial communication found in a business letter," that a jury could reasonably conclude that "errors and typos in emails are common in our fast paced, electronic business environment," and that "an employer would not fire an employee with 25 years of experience with their best product, based upon 4 email typos."  (Doc. 50 at 32.)  For this reason, Plaintiff argues that, on its face, Exact's proffered reason did not actually motivate or was insufficient to motivate the discharge.  Plaintiff also points to other evidence of pretext in the record:  (1) Exact did not follow its own disciplinary policy or practice when it terminated Plaintiff; (2) Exact made false statements to the EEOC through McDonald and Pannkuk's affidavits and changed its position about who made the decision to terminate Plaintiff; and (3) management and executive employees at Exact made discriminatory comments about older workers.

When Plaintiff was terminated, she received no progressive discipline but instead was simply notified of her termination.  Plaintiff concedes that Exact's Corrective Action Policy does not mandate progressive discipline.  The Sixth Circuit, however, has held that even when a

24

policy "cannot be construed as an absolute guarantee"—for instance, when a company's reduction-in-force policy states that temporary employees will "generally" be the first to be laid off—an "arguable failure to follow its own written . . . policy can support the inference that it was determined to layoff employees on the basis of age." *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 126 (6th Cir. 2007).  A jury is entitled to consider the failure to follow the general policy as evidence of pretext. *Id.*; *see also Skalka v. Fernaldo Envtl. Restoration Mgmt. Co.*, 178 F.3d 414, 422 (6th Cir. 1999) (holding that a jury need not accept as credible an employer's explanation of why it deviated from its stated reduction-in-force procedure).  Other circuits have also consistently held that an employer's deviation from an established policy raises a triable issue of protect.  *See, e.g.*, *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015) ("[W]hen an employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext."); *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) ("[A]n employer's failure to follow its own internal employment procedures can constitute evidence of pretext.").

In response to Plaintiff's argument regarding the disciplinary policy, Defendant relies only on a district court case in which the plaintiff argued that the employer failed to follow its employee handbook that stated that length of service with the company "is of prime importance . . . in matters concerning . . . your future employment" but also contained an exception to the policy during a reduction in force. *Mathur v. Meriam Process Tech.*, No. 1:10-cv-121, 2012 WL 1965729, at *5 (N.D. Ohio May 31, 2012).  In addition to the fact that *Mathur* is not binding on this Court, there are at least two good reasons not to follow it here.  First, *Coburn*—a Sixth Circuit case, albeit an unpublished one—suggests that even when a policy includes language that

does not guarantee that the policy will always be followed, the failure to follow it can show pretext. 238 F. App'x at 126. Second, although the policy makes an express exception for critical incidents, which can lead directly to termination, a reasonable jury could examine the list of examples of "critical incidents," which includes such infractions as workplace violence and theft, and make a determination that, in fact, Guyton's termination was not the result of a critical incident. Further adding to the evidence of pretext is testimony from former human resource manager Cole that she was unaware of *any* time that Exact skipped these steps in the Corrective Action Policy and that the type of situations where a company might skip such a step involved serious misconduct. (Cole Dep., Doc. 38-1 at 59; *see also* Dunn Dep., Doc. 51-1 at 59-60.) And even if Guyton was terminated because of a "critical incident," the company did not follow the other steps that the policy provided for such terminations, including immediate loss of access to the company's systems and arrangements for the employee to collect her personal property from her manager.

As to the alleged discriminatory comments by Pannkuk and unnamed executives, such remarks may "serve as probative evidence of pretext." *Bartlett v. Gates*, 421 F. App'x 485, 491 (6th Cir. 2010) (citing *Risch v. Royal Oak*, 581 F.3d 383, 393 (6th Cir. 2009)). Discriminatory comments may constitute pretext even when they are made by a nondecisionmaker or do not "coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment." *Risch*, 581 F.3d at 393 (quoting *Ercegovich*, 154 F.3d at 356. In determining the significance of a discriminatory remark, "courts must carefully evaluate factors affecting the statement's probative value, such as the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action, as well as whether the statement

buttresses other evidence of pretext." *Ercegovich*, 154 F.3d at 357 (internal quotations marks and citations omitted).

Although the comments by unidentified executives likely have little probative value under this standard, Pannkuk's presentation is relevant to pretext. Pannkuk was a "high-level official[] who . . . had managerial authority over personnel decisions or otherwise played a meaningful role in such decisions." *Vincent v. Brewer Co.*, 514 F.3d 489, 498 (6th Cir. 2007); *see also Ercegovich*, 154 F.3d at 355 (holding that statement of a high level official who "was involved in some parts of the discussion" and by virtue of his role "was in a position to shape the attitudes, policies, and decisions of the division's managers" demonstrated a genuine issue of fact as to whether he was involved in the adverse employment action). Indeed, the mix-up, or changing story, of the affidavit provides even stronger evidence that Pannkuk was involved in the decision-making process. Additionally, both McDonald and Cole testified as to the content of the presentation, one of which took place around the same time (May 2010) that Guyton was notified of her termination (April 2010). *Cf. Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir. 1993) (holding that statements made a year before the layoff were too long before the layoff to have influenced the termination decision). Moreover, construing the facts in the light most favorable to Guyton as the Court must do on summary judgment, the "purpose and content of the statement," given that it was directed to human resource managers with influence in personnel decisions, suggests that it may have been intended to encourage hiring younger employees and firing older ones to keep costs down. *Ercegovich*, 154 F.3d at 357. Such an inference is further buttressed by the fact that at least some of the intended audience interpreted the message as such, and by testimony that Exact was in a cost-conscious, budget-cutting mode at that time. (McDonald Dep., Doc. 30-1 at 76-77, 81.)

Plaintiff next raises irregularities in testimony to the EEOC and the OUC as evidence of pretext.  To the extent that Plaintiff seeks to rely on Exact's purportedly false statements to the EEOC, made through McDonald and Pannkuk's affidavits, and to the OUC, the Court finds that a jury could reasonably interpret the submission of the unsigned McDonald affidavit, as well as the statement in Pannkuk's affidavit that she and McDonald decided to terminate Guyton, to be evidence of pretext.  The OUC form does not raise the same inference, however.  This form was not written by Exact nor authenticated in discovery, and neither Pannkuk nor any other employee recalled seeing the document or making a statement to the OUC that the separation was by mutual agreement.[5]

The misrepresentations to the EEOC are different.  Defendant insists that its communications to the EEOC do not raise an inference that Plaintiff's age was the "but-for" cause of her termination, the ultimate issue in an ADEA case, but this argument is unavailing.  The Sixth Circuit has not yet had occasion to rule on whether an inconsistent or false statement to the EEOC, or an affidavit that was submitted without the affiant's permission, is relevant to the issue of pretext.  But the Fifth Circuit has held that "a misleading explanation [to the EEOC] regarding [a plaintiff's] termination . . . constitutes evidence of pretext."  *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 237 (5th Cir. 2015); *see also Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013).  The Eight Circuit has held that evidence of an employer's EEOC position statement that was inconsistent with other evidence in the case is relevant because the inconsistency "tends to prove that the reasons it offered at trial were pretextual."  *Maschka v.*

---

[5] In her opposition brief, Plaintiff cites to her deposition for the proposition that she did not tell the state that the separation was by mutual agreement, asking the Court to draw the inference than only Exact could have communicated this information, but this assertion does not actually appear in the deposition testimony.  (*See* Guyton Dep., Doc. 35 at 179-80, 215.)  The Court, therefore, disregards this assertion.

*Genuine Parts Co.*, 122 F.3d 566, 570 (8th Cir. 1997). *Cf. Graessle v. Nationwide Credit Inc.*, No. 2:03-cv-00758, 2007 WL 1514003, at *12 (S.D. Ohio May 22, 2007) (holding that because the testimony of two executives was *consistent* with the company's EEOC position statement, it did not constitute evidence of pretext). Although not entirely on point, McDonald and Pannkuk's affidavits, which are contradicted by their deposition testimony, tend to be probative of pretext under the same reasoning. This Court adopts the reasoning of the Fifth and Eighth Circuits and finds that the affidavits and other statements to the EEOC may raise an inference of pretext.

As a last-ditch attempt to argue that Plaintiff cannot meet her burden to rebut Defendant's legitimate nondiscriminatory reason for terminating her, Defendant contends that it should be shielded from liability because courts may not second-guess an employer's business judgment. (Doc. 46 at 20.); *see Adams v. Tenn. Dep't of Fin. And Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006) ("The aim of a court in assessing an alleged Title VII violation 'is not to review bad business decisions, or question the soundness of an employer's judgment.'" (quoting *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991), *abrogated on other grounds by Hill v. Nicholson*, 282 F. App'x 503, 508 (6th Cir. 2010))); *Brown v. Renter's Choice, Inc.*, 55 F. Supp. 2d 788, 795 (N.D. Ohio 1999) ("An employer may make employment decisions for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (internal quotation marks and citation omitted).

This argument fails because Plaintiff has introduced evidence of discriminatory comments from which, in conjunction with other evidence in the record, a reasonable jury could infer that Defendant's proffered reason for terminating Plaintiff was pretextual. Moreover, an employer's business judgment "is not an absolute defense to unlawful discrimination." *Wexler*,

317 F.3d at 576 (citing *E.E.O.C. v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir. 1997)).  The Sixth Circuit has cautioned that "decisions made on the basis of subjective criteria," like the decision to terminate Guyton, "can provide a ready mechanism for discrimination, and thus such decisions are carefully scrutinized."  *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013) (quoting *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 504-05 (6th Cir. 2011)).  The court may take into account the reasonableness of an employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."  *Wexler*, 317 F.3d at 576 (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).  In *Wexler*, the Sixth Circuit held that the district court improperly invoked the business judgment rule to exclude consideration of evidence relevant to pretext, including evidence that the defendant was aware that the decline in sales revenue was not the fault of the plaintiff, a store manager, and evidence of "age-related statements" from top company executives.  *Id.* at 577.  *See also Guerra v. Convergys Customer Mgmt. Grp., Inc.*, No. C-1-08-666, 2010 WL 3522472, at *12 (S.D. Ohio Sept. 7, 2010) (holding that there was sufficient evidence of pretext that defendant "exaggerated the employee complaints against plaintiff for reasons that remain unclear," "plaintiff had by all accounts had an impressive career" with the company, and it was unclear "how plaintiff's work performance and behavior had deteriorated to the point where defendant lost all confidence in her in the very brief time period" of only a few weeks).

Here, there is evidence from which a jury could infer that the decision to terminate Guyton, who had 25 years of experience with the company and favorable performance reviews, based on one conversation with the user group president relating to email typos and technical problems, was not a reasonable one, particularly given the company's departure from its standard

disciplinary procedure, Guyton's supervisor's disagreement with the decision, and Exact's statements to the EEOC. Nor can Exact take shelter in the "honest belief" doctrine, which provides that "[a]s long as the employer held an honest belief in its proffered reason, 'the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.'" *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285-86 (6th Cir. 2012) (quoting *Smith*, 155 F.3d at 806); *see also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Viewing the facts in the light most favorable to Guyton, there is evidence that Exact did not make "a reasonably informed and considered decision before taking its adverse employment action," given the nature of Hayner's complaints, Guyton's previous strong work performance, McDonald's opposition to her termination, and the fact that others had typos in emails but were not terminated for that offense. *Wright*, 455 F.3d at 708 (citation and internal quotation marks omitted). The evidence of Exact's arguable failure to follow its disciplinary process, and the confusion or misrepresentation about who the decisionmaker was—as evidenced by Pannkuk's affidavit to the EEOC—further support the Court's conclusion that the honest belief doctrine does not apply here. *See Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) ("The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process."); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (noting that the "key inquiry . . . is whether the employer made a reasonably informed and *considered* decision before taking' the complained-of action" (emphasis added) (internal quotation marks omitted)).

Taken together, discriminatory comments by managers, false statements to the EEOC, and the arguable failure to follow the disciplinary policy constitute evidence of pretext that must

go to a jury.  The Court **DENIES** Exact's Motion for Summary Judgment on Guyton's age-discrimination claim.

## IV.    CONCLUSION

The Court **DENIES** the Amended Motion for Summary Judgment on Plaintiff's age-discrimination claim.  (Doc. 46.)  Because Plaintiff has abandoned her sex-discrimination claim, the Court **GRANTS** the Amended Motion for Summary Judgment on that claim.

**IT IS SO ORDERED.**

**___s/ Algenon L. Marbley_____**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  July 21. 2016**